IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LAURIE A. WILLIAMSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 15-cv-628-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Laurie A. Williamson, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in September 2011, alleging disability beginning on January 30, 2007.   After holding an evidentiary hearing, ALJ Victoria A. Ferrer denied the application on January 30, 2014.   (Tr. 10-24).[2]   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 1).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 10.

[2] Consistent with the usual practice in social security cases, the Court cites to the transcript number stamped in the lower right hand corner of each page of the administrative transcript, i.e., (Tr. __). Plaintiff's counsel should follow this practice in future cases rather than using the page numbers assigned by the CM/ECF system.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in weighing the medical opinions.

2. "The ALJ abused discretion by finding 'severe' impairments ...and then later finding 'mild' impairments."

3. The ALJ's credibility analysis was erroneous.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an

2

alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative

3

answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Williamson was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

4

## The Decision of the ALJ

ALJ Ferrer followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date, and that she was insured for DIB through December 31, 2012.   She found that plaintiff had severe impairments of degenerative arthrosis of both knees, degenerative disc disease and spondylosis of the lumbar and cervical spine, obesity, and mood disorder.   She further determined that these impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Williamson had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is limited to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1963 and was 43 years old on the alleged date of onset, January 30, 2007.  (Tr. 141).   She was 5'1" and weighed 200 pounds.  (Tr. 147). She had a GED.   She had worked as an assembler in a factory from 1999 to 2007, as "unskilled labor" in a comic book factory from 1997 to 1998, and as a cook/waitress from 1993 to 1998.  (Tr. 148).

In a Function Report filed in October 2011, plaintiff said that her ability to work was limited because she could not sit, stand or walk "long or short periods at a time."   (Tr. 169).   She had no problems with personal care.   She did only light household chores when her medications took effect.   She was unable to prepare a meal alone and only made sandwiches or heated up left overs in the microwave. Her husband usually did the grocery shopping, but she shopped maybe once a month.   In terms of social activities, she visited her mother and mother-in-law every other week.   She said she had no problems paying attention.   Plaintiff said she could not stand or sit for longer than 15 minutes, and could walk only ½ of a block.   (Tr. 168-177).

### 2.    Evidentiary Hearing

Ms. Williamson was represented by an attorney at the evidentiary hearing on August 16, 2013.   (Tr. 31).

Plaintiff testified that her husband did most of the household chores and cooking.   She folded clothes and tried to keep the dishes done, but it took her a long time.   She had one friend whom she saw once a month and talked to on the phone daily.   She saw her grandchildren about once a month.   She watched television and read.   She attended church with her mother-in-law probably once every four months.   (Tr. 35-40).   She visited her mother-in-law once a month, and she helped her father with his finances.   (Tr. 42).

Ms. Williamson testified that, probably once a week, she did not get out of bed all day.   (Tr. 41).   She said she had pain in her back and neck.   She took Vicodin.   She also had depression because of her physical problems.   When she

stayed in bed all day, it was because of both physical pain and depression.   (Tr. 44-47).

Plaintiff testified that she had crying spells almost every other day, for almost the last year.   (Tr. 48).

A vocational expert (VE) also testified.   The ALJ asked him a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, and was able to stand/walk for 6 hours total per day and sit for 6 hours total per day, limited to occasional pushing and pulling with the lower extremities; occasional climbing of ramps, stairs, ladders, ropes and scaffolding; occasional balancing, stooping, kneeling, crouching and crawling; simple, routine and repetitive tasks and simple instructions; only occasional changes in the workplace; able to meet production rate pace, but no fast-paced, high-production demands such as assemble line work.   The VE testified that this person could do jobs that exist in significant numbers in the regional and national economies.   Examples of such jobs are such as fast food worker, cashier and housekeeper.   (Tr. 52-54).

**3.    Medical Treatment**

Plaintiff had on on-the-job injury in March 2006.   She had pain in her neck and left shoulder.   She saw Dr. Heffner for a neurosurgical consultation in June 2006.   Dr. Heffner noted that an MRI showed degenerative changes at C5-6 and C6-7, with a possible disc protrusion at C4-5.   He did not recommend surgery. (Tr. 228-229).   In April 2007, she continued to complain of diffuse widespread pain involving he low back, neck, shoulders, arm and legs.   He again noted that

surgery was not indicated, and suggested long term pain management.   (Tr. 233).

Pain management specialist Dr. Malla gave Ms. Williamson a series of epidural injections in the cervical lumbar spine in June, August and October 2007. These injections gave her temporary pain relief.   (Tr. 291-293).

In November 2008, plaintiff told Dr. Malla that the last treatment gave her more than 50% pain relief for 3 months.   He repeated the injections.   In February 2009, she said she had more than 50% pain relief for 2 ½ months from the last injections.   Injections were repeated, and, in September 2009, she reported more than 50% pain relief in her back for 2 ½ months and more than 50% pain relief in her neck for 3 months.   The injections were again repeated.   She returned in March 2010.   She no longer had insurance, so she was treated with medication. On exam, she had tenderness in the cervical spine with no muscle spasm.   Range of motion of the cervical spine was normal, but with pain.   Range of motion of both shoulders was normal with no impingement.   Motor strength of the upper extremities was normal with no neurological deficits and no wasting.   Grip strength was 3/5 bilaterally.   There was moderate tenderness at L5-S1 with no muscle spasm.   Range of motion of the lumbar spine was reduced in all directions. Motor strength was 5/5 bilaterally .   Superficial reflexes were within normal limits. Dr. Malla prescribed Flexeril and Lortab.   (Tr. 294-301).

The earliest office note from primary care physician Dr. Mark Preuss is dated February 11, 2010, although plaintiff was apparently already an established patient at that time.   She complained of bilateral knee pain.   On exam, she had no redness or swelling of the knees.   She had mild crepitus bilaterally.   The

diagnosis was osteoarthritis bilateral knees.   She was already taking a number of medications, including Ultram, Xanax, Flexeril, Lexapro and Tramadol.   She told the doctor that her niece had stolen her last refill of Tramadol.   She was prescribed Daypro and Toradol.   (Tr. 448).   Ms. Williamson returned for medication review in March 2010.   She was on multiple medications.   She complained of low back and neck pain, as well as depression.   She was not suicidal, but was sad on a daily basis and had loss of interest, agitation and irritability.   Relevant diagnoses were depression, suboptimally controlled, and chronic neck and back pain.   Risperdal was added to her other medications.   (Tr. 446).   In April 2010, she complained of back pain.   On exam, she was moderately uncomfortable trying to stand and get up.   She had difficulty bending at the waist.   Straight leg raising was positive at 45 degrees.   Dr. Preuss recommended physical therapy.   (Tr. 447).

Plaintiff returned to Dr. Preuss in May 2010.   She was taking Lexapro and Risperdal for depression.   The Risperdal helped somewhat.   She continued to have low back pain with some numbness and tingling in the left upper leg.   She felt "off balance" often.   She said she did not want to return to Dr. Malla because he "treated her poorly."   Dr. Preuss gave her an intramuscular shot of Toradol and increased the dosage of Risperdal.   (Tr. 445).   On June 18, 2010, Dr. Preuss noted that the increased dosage of Risperdal was helping, and her depression had improved, but she still had "some sad times."   She complained of pain all the way down her leg into her foot.   She had tenderness in the lower lumbar area and positive straight leg raising on the left at about 30 degrees.   He gave her another

9

Toradol shot and recommended a lumbar MRI.   (Tr. 444).

Ms. Williamson was seen in the emergency room at Chester Memorial Hospital in June 2010 following a car accident.   A CT scan of the cervical spine showed moderately severe narrowing at C5-6 and C6-7, with moderate central spinal stenosis, and mild to moderate degenerative disc disease at C3-4 and C4-5. (Tr. 317).   The diagnosis was chest wall contusion and abdominal contusion following a motor vehicle accident.   Vicodin was prescribed.    (Tr. 310).

Dr. Preuss saw her the next day and diagnosed multiple significant contusions, a rib fracture, possible concussion, and abrasions.   (Tr. 443).

On June 28, 2010, Dr. Preuss noted that a lumber MRI done before the car accident showed annular bulging at L4-5, hypertrophic facet arthrosis, possible slight compression of the left L5 nerve root, and small disc protrusion at L5-S1 with compression of the right S1 nerve root.   He suggested that she return to a pain clinic for management of her low back pain.   (Tr. 442).   In August 2010, she reported that the pain clinic she had been seeing said they would not treat her any longer.   (Tr. 440).   In December 2010, she told Dr. Preuss that she had not gone to the pain management clinic in St. Louis as they had discussed, but she was willing to go to a clinic in Cape Girardeau, Missouri.   Dr. Preuss noted that she looked fatigued and "somewhat sedated."   He refilled her Lortab and gave her a Toradol shot.   (Tr. 439).

Plaintiff began treatment at Brain & NeuroSpine Clinic in Cape Girardeau, Missouri, a pain management clinic, in January 2011.   On exam, she weighed 220 pounds.   Gait and station were normal.   Strength was 5/5 in the upper and lower

extremities.   Grip strength was 4+/5 bilaterally.   Straight leg raising was negative. Sensation was intact to light touch.   She showed no depression, anxiety or agitation, memory was intact, and attention and concentration were normal.   An MRI showed degenerative changes, most significantly at the L5-S1 level.   She was prescribed Neurontin and a series of injections.   She was to continue with medication management by her primary care doctor.   (Tr. 417-420).   She was administered epidural lumbar injections in January and February 2011.   (Tr. 422-429).   In March, she reported that she had 20% pain relief.   She was to go for a neurosurgical consultation.   (Tr. 432).

In July 2011, plaintiff fractured her right ankle jumping into a swimming pool.   The fracture required open reduction and internal fixation.   By October 2011, the fracture was healed and she was able to bear full weight.   (Tr. 468-475).

In December 2011, plaintiff reported to Dr. Preuss that her husband's hours at work had been cut and she was applying for disability.   She also reported that some of her Xanax had been stolen.   She asked if she could take more Xanax and Lortab.   Dr. Preuss noted that she was "somewhat tearful."   She complained of difficulty sleeping.   The doctor did not allow for any more Lortab or Xanax, and told her she has to "hold steady."   She told her to restart Risperdal, and said she had to take it "faithfully."   He also noted that it was not "to her benefit to up analgesics or addictive medications."   She was also given an injection of Toradol. (Tr. 507-508).

On January 3, 2012, plaintiff was taking Risperdal as well as Lexapro, and did not feel as sad or like crying.   She had a form for Dr. Preuss to fill out for her

11

disability application.   (Tr. 506).   In February 2012 she was again a little tearful. She again asked for more Lortab and Benzodiazepines (Xanax), but Dr. Preuss told her "she was not to do that."   (Tr. 575).   In March 2012, she was depressed and agreed that a change of antidepressants might be useful.   She was started on Effexor instead of Lexapro.   A month later, her depression was somewhat improved.   She had good eye contact, was more alert, and was smiling some.   (Tr. 573-574).   In September 2012, she was seen for complaints related to sinusitis/upper respiratory infection/ bronchitis.   (Tr. 572).

Her date last insured for DIB was December 31, 2012.

Dr. Preuss saw her for an upper respiratory infection in January 2013.   (Tr. 571).   One week later, she told Dr. Preuss that her niece had again stolen some of her pills.   He told her that she is responsible for her own meds.   He gave her enough Klonopin and Percocet to get her through the five days until her regular prescriptions could be refilled.   He stated that, "In the future we'll take a tough stand and refuse any further medications should she ask me and tell me someone stole them."   (Tr. 570).

The last visit with Dr. Preuss was in April, 2013.   Plaintiff admitted to Dr. Preuss that she had not been taking her depression medication as she was supposed to.   Her mother had died and she had been drinking alcohol.   He told her to continue Effexor and Wellbutrin, and to avoid alcohol.   (Tr. 568).

Ms. Williamson attended 10 counselling sessions at the H Group from April 2013 to July 2013, after her date last insured for DIB.   The notes document plaintiff's on-going difficulties in dealing with her family.   (Tr. 598-613).

12

### 4.    Treating Doctor's Opinion

In January 2012, Dr. Preuss completed a form assessing plaintiff's ability to do physical work-related activities.   (Tr. 511-513).   He indicated that, in an 8 hour workday, plaintiff could stand/walk for a total of 3 hours and sit for a total of 3 hours.   She could stand/walk for ½ hour at a time and sit for ½ hour at a time. She could never climb, stoop, crouch or crawl, and could only occasionally balance and kneel.   He said that her ability to reach and push/pull were affected, but did not say how.

The form asked the doctor to cite medical findings in support of his opinion. He cited degenerative disc disease at C5-6 and C6-7, left shoulder arthrosis, left paracentral disc herniation at L5-S1, and osteoarthritis and history of patellar fracture in the left knee.   Dr. Preuss said that plaintiff's limitations dated from June 2010.

### 5.    Opinions of State Agency Consultants

There was no consultative physical examination.

James Peterson, Ph.D., performed a consultative psychological exam in October 2011.   (Tr. 478-480).   He noted that plaintiff was lucid, alert, friendly and cooperative.   Eye contact was appropriate and speech was normal.   She was oriented and displayed no memory problems.   He diagnosed mood disorder due to a general medical condition.

### Analysis

Plaintiff applied for DIB only.   She was last insured for DIB as of December 31, 2012.   In a DIB case, a claimant must establish that she was disabled as of her

date last insured.   *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).    It is not sufficient to show merely that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date.   *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Ms. Williamson first argues that the ALJ erred in assigning no weight to Dr. Preuss' opinion.

Dr. Preuss is, of course, a treating doctor.   The opinions of treating doctors are to be evaluated under 20 C.F.R. §404.1527.   Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability."   *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).   If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.

Supportability and consistency are two important factors to be considered in weighing medical opinions.   See, 20 C.F.R. §404.1527(d).   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527.

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may "bend over backwards" to help a patient obtain benefits.   *Hofslien v. Barnhart*, 439 F.3d 375,

14

377 (7th Cir. 2006). See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds no error in the ALJ's weighing of Dr. Preuss' opinion.   After reviewing the medical evidence, ALJ Ferrer gave "no weight" to his opinion because it was poorly supported, inconsistent with the medical evidence as a whole, and inconsistent with the record as a whole.   She acknowledged that diagnostic tests demonstrated objective abnormalities, but pointed out that physical examinations showed that plaintiff had a greater functional capacity than was indicated by Dr. Preuss.   Further, the medical records indicated that she responded well to treatment.

Immediately prior to her discussion of Dr. Preuss' opinion, the ALJ discussed the medical evidence in detail.   For instance, she noted that a physical exam in May 2007 showed tenderness of the cervical and lumbar spine, full range of motion of the cervical spine and reduced range of motion of the lumbar spine. Range of motion of all other joints was normal.   Neurological exam was normal, motor function was normal, and plaintiff had full strength in the upper extremities. In January 2011, physical exam showed normal gait and station.   Neurological exam was normal.   Further, the medical records reflected that conservative treatment was effective in reducing plaintiff's pain.   (Tr. 19-20).

In support of her argument that Dr. Preuss' opinion should have been given controlling weight, plaintiff cites to Tr. 586-588.   She points out that Dr. Preuss recommended no lifting , bending or twisting at Tr. 588.   However that was in April

2010, and Dr. Preuss prescribed physical therapy on that same date.   By January 2011, she had evidently improved.   An exam at Brain & NeuroSpine Clinic in in that month showed normal gait and station, full strength in the upper and lower extremities, 4+/5 grip strength bilaterally, negative straight leg raising, and intact sensation.   (Tr. 417-420).   Plaintiff also points out that Dr. Preuss noted that she had trouble getting up onto the table and that he "reported claimant as 'off balance.'"   See, Doc. 15, p. 3.   In fact, Dr. Preuss wrote that plaintiff said that she "[h]as felt off balance often."   (Tr. 586).   Dr. Preuss did not report that he observed that she was off balance or that he tested her balance.   In short, the isolated notes cited by plaintiff do not contradict the ALJ's conclusion that Dr. Preuss' opinion was not supported by the medical evidence as a whole.

An ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of another physician, internally inconsistent, or inconsistent with other evidence in the record.   *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax."   *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)**.**   The Court finds that ALJ Ferrer more than met the minimal articulation standard here.

Plaintiff's second argument is a complete nonstarter.   She appears to argue that the ALJ committed error by finding that she had a severe mental impairment

16

(mood disorder) at step two, but also finding that she had only mild and moderate functional limitations when determining whether the "B criteria" were met.   This argument rests upon a misunderstanding of the process for evaluating mental impairments.

The ALJ properly followed the process for evaluating mental impairments set for in 20 C.F.R. §505.1520a.   Simply put, to the extent that plaintiff is arguing that a finding that she has a severe mental impairment mandates a finding that she has severe limitations in considering the B criteria, she is mistaken.

Plaintiff also seems to suggest that the finding that she had a severe mental impairment mandates a finding that her condition met or equaled a listing.   Again, she is incorrect.   "[T]he step two determination of severity is 'merely a threshold requirement.'" *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010), citing *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir.1999).

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.   In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."   20 C.F.R. §404.1525(d).   The claimant bears the burden of proving that she meets or equals a listed impairment.   *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).   Here, the only evidence cited by plaintiff comes from the H Group counselling notes.   See, Doc. 15, p. 4. However, those notes post-date her date last insured, and, in any event, do not come close to establishing that she met or equaled a listing.   In particular, plaintiff

17

claims that those records establish that she was unable to leave her home for hours at a time due to anxiety.   However, that is an overstatement.   The note, dated April 29, 2013, actually says, "Processed Laurie's feelings about her father and sisters calling her names and making accusations against her.   Processed that it may take hours for her to leave her home to go to her father's due to Anxiety."   (Tr. 612). The note does not suggest that plaintiff was generally unable to leave her home due to anxiety.   And, crucially, plaintiff never claimed before the ALJ that she was unable to leave her home for hours at a time due to anxiety.

Lastly, plaintiff argues that the credibility determination was erroneous. Most of her argument criticizes the ALJ for using boilerplate language.   However, the use of the boilerplate language does not automatically require reversal.   It is harmless where the ALJ goes on to support her conclusion with reasons derived from the evidence.   See, *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).

The Court must use an "extremely deferential" standard in reviewing an ALJ's credibility finding.   *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). The Court cannot reweigh the facts or reconsider the evidence, and can upset the ALJ's finding only if it is "patently wrong."   *Ibid*.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005),

18

and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3.   While plaintiff's claims cannot be rejected *solely* because they are not supported by objective evidence, 20 C.F.R. §404.1529(c)(2), the ALJ may take that fact into consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration."  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Here, the ALJ discounted plaintiff's testimony because it was not supported by the objective medical record, including the results of physical and mental exams. The ALJ noted that plaintiff testified to severe limitations, including that she had to spend 6 hours out of her day reclining or laying down, and that she stayed in bed all day at least once a week.   However, the ALJ pointed out that the record demonstrated that plaintiff was able to perform significant activities of daily living. For example, she stated in a function report that she was able to prepare simple meals, do light housework, go out every day, drive a car and go regularly to the homes of her mother and mother-in-law.   Further, the ALJ pointed out that plaintiff made statements to her health care providers which contradicted her claims of disabling symptoms.   She told her doctors several times that she had significant pain relief from epidural injections.   In January 2012, she told her doctor that medication helped her depression and she was not as sad and did not

19

feel like crying.  See, Tr. 21.

Plaintiff takes issue with the ALJ's consideration of her daily activities.   An ALJ is required to consider, among other factors, a claimant's daily activities in determining whether she is disabled.   20 C.F.R. §404.1529(a), SSR 96-7p, at *3. However, the ALJ did not impermissibly equate her daily activities with an ability to sustain full-time work.  Rather, she found that plaintiff's ability to engage in a range of daily activities indicated that she was capable of doing more than she claimed.  This is a permissible conclusion.  *Pepper v. Colvin*, 712 F.3d 351, 368-369 (7th Cir. 2013).

Plaintiff also argues that the records of the H Group substantiated her testimony.  See, Doc. 15, p. 6.  Again, those records post-date her date last insured.  She points to no evidence in the medical records during the insured period that substantiate her claims of disabling mental limitations.  The counselling notes document that plaintiff had difficulty dealing with her family. For instance, her son's girlfriend physically attacked her and the police were called, her niece called her fifteen times in one day asking for some of her pain medications, her niece stole her Vicodin and Xanax, and her son refused to get a job.  (Tr. 600-603).  The counselling notes certainly document unpleasant and difficult events in plaintiff's life, but they do not corroborate her testimony.

Plaintiff has not demonstrated that the credibility determination was "patently wrong," and therefore it cannot be overturned.   *Pepper*, 712 F.3d at 367.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ

20

Ferrer committed no errors of law, and that her findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Laurie A. Williamson's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   July 8, 2016.**


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**